## UNITED STATES  DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| Kevin Koch, Nancy Zook and Daniel Braun, IN THE NAME OF THE UNITED STATES GOVERNMENT PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. SECTION 3730, | : : : : : : | |
| | : | DOCKET NO. |
| Plaintiff, | : : | |
| vs. | : | |
| BI  Incorporated | : : : | **QUI TAM  COMPLAINT** |
| Defendants. | : : : | |

Plaintiff-Relators hereby file this Complaint pursuant to Title  42 Section 132a-7a as well as Section 31 U.S.C. Title 3729 and 3730 and pursuant to Title 28 Section 1331 in that it is a civil action arising under the laws of the United States, and hereby states as follows:

### *I. Parties*

1.       The Plaintiffs are Kevin D. Koch, with a principal address of 18 Lisa Drive, Brick, New Jersey 08724 ("Koch"), Nancy Zook, with a principal address of 2620 Monmouth Road, Jobstown, New Jersey 08041 ("Zook") and Daniel Braun, with a principal address of 914 Red Bank Avenue, Ocean Gate, New Jersey 08740-1105 ("Braun"). Koch, Zook and Braun are hereinafter collectively referred to as Relators.

2.       Koch, as are all of the Relators, is employed by the New Jersey State Parole Board ("SPB"). Koch is a senior investigator and has been employed by the State of New Jersey since 1996, and with SPB since September of 2004.

3.       Zook is a senior investigator and has been employed by the State of New Jersey since 1997 and with SPB since May of 2004.

4.       Braun is a senior investigator in the special investigations unit and has been employed by the State of New Jersey since 1997 and with SPB since May of 2004.

5.     The Defendant is BI Incorporated ("BI" or "Defendant") which was formed in 1978 and is headquartered in Boulder, Colorado with a principal address of 6400 Lookout Road, Boulder Colorado, 80301. BI claims that it employs more than 500 people in 40+ locations throughout the United States. BI represents that it provides intensive supervision and treatment services, including reentry services, and community-based service offices throughout the United States that are intended, if properly delivered, to help alleviate jail overcrowding, budget shortfalls, increased recidivism, while enhancing community public safety.

## II. Jurisdiction

6.     This Court has jurisdiction pursuant to Title 42 Section 132a-7a as well as Section 31 U.S.C. Title 3729 and 3730 in that this is a civil action arising under the laws of the United States.

## III. Venue

7.     The venue is proper in this District by a virtue of Title 28 Section 1391(b) in that the Defendant maintains a principal place of business in the District.

## IV. Factual Background

### A. The Day Reporting Centers

8.     The SPB operates "Day Reporting Centers"("DRC") in the State to provide a variety of services and supervision to parolees requiring special attention. The program services parolees who are at the point of parole revocation because of continuous violations of parole conditions but who it has been determined would benefit from a structured program offering increased level of services and surveillance.

### B. Federal Funding

9.     A Federal Grant from the U.S. Department of Justice ("DOJ") is passed through to the New Jersey Department of Corrections ("DOC") which funds a contract agreement between the SPB and BI. to operate DRC's throughout the State as more particularly set forth herein.

10.     There are three different DRC program titles that are operated in the State of

New Jersey through this Grant, known and referred to as the (i) Elizabeth Day Reporting Center, (ii) Atlantic City Day Reporting Center, and (iii) Perth Amboy Day Reporting Center.

### 1. Elizabeth Day Reporting Center

11.     The first is the Elizabeth Day Reporting Center for Violent Offender Incarceration and Truth in Sentencing program. The Federal CFDA number is 16.586 and the Award amount to BI is based on a per diem service.

12.     The beginning of the contract period is July 1, 2005 through June 30, 2006 and it is believed this program was extended into the next fiscal year. The federal expenditures for this program through June 30, 2006 was $1,304,517.00.

### 2. Atlantic City Day Reporting Center

13.     The second program title funded through DOJ is the Atlantic City Day Reporting Center for Violent Offender Incarceration and Truth in Sentencing incentive grants. It is the same Federal CFDA No. 16.586 and is also based on a per diem service amount for services provided to the parolees.

14.     This contract was awarded for a three-year period beginning November 15, 2004 through November 14, 2007 and the federal expenditures through the year-end of June 30, 2006 were $966,685.00.

### 3. Perth Amboy Day Reporting Center

15.     The third is the last program title funded by the DOJ is the Perth Amboy Day Reporting Center. The Federal CFDA number is the same 16.586 and the Award is also based on per diem services.

16.     The beginning contract of work period was March 1, 2006 through February 28, 2008 and the federal expenditures through June 30, 2006 were $140,012.00.

### C. The Program Specifications and Contract For Services

17.     On or about August 16, 2004 the SPB issued specifications requesting proposals for

the operation of a day reporting centers ("Bid Specifications"), a copy of which is attached hereto and made a part hereof and marked as **Exhibit "A"**.

18.   The Bid Specifications expressly set forth in Section 1.2 of the Bid Specifications that the DRCs are intended to provide a variety of services and an *intensive* level of supervision to parolees requiring special attention.  The program services parolees who are at the point of parole revocation because of continuous violations of parole conditions but who it has been determined would benefit from a *structured program offering increased level of services* and surveillance.  The SPB wanted to contract with a private provider for the development operation of this program.

19.   The target population for the DRC was intended to be male and female adult and youth offenders who were currently under the supervision of the SPB in Atlantic City.  The DRC was to have a capacity of 50 to 75 slots with a maximum number of slots not to exceed 75.  The contractor was to be reimbursed on a per diem basis for those parolees who are assigned to the DRC and who are participating in the program.  The contractor will not be reimbursed for individuals who have been discharged from the program or who have absconded, all of which is expressly set forth in Section 1.2 of the Bid Specifications.

20.   The program was intended to consist of three phases as specified in Section 3.1 of the Bid Specifications.  The contractor was required to assure that assigned parolees were continuously engaged in program-related activities and services throughout each program day [Article 3.1 bid specifications].

21.   Each parolee is required to participate in a three-phase program within the DRC.  The three phases must incorporate the following:

### Phase 1

Clients (i.e. the parolees) shall be in Phase 1 for a maximum of two weeks.  It is understood that all requirements of this phase will be met within this time frame.  The following services must be provided in Phase I:

-4-

● All clients shall report seven (7) days a week for a minimum of five (5) hours per day.

● All clients shall receive an orientation that includes review of all rules, regulations, conditions of participation, a client handbook and point system ("Orientation Documents") within the first 48 hours.

● All clients must sign and the contractor, or in the case at hand, BI, counter sign acknowledgment that the orientation was given and that client understands.

● Client issued ID card.

● Client given a tour of facility.

● Client must be given a copy of all of all Orientation Documents.

● Client files must be created containing all Orientation Documents.

● The contractor, or in the case at hand, BI, shall conduct an assessment of each client within the first week that consists of a

(I) criminogenic needs, (ii) educational and vocational aptitude, (iii) level of service- inventory - revised, and (iv) substance abuse evaluation. A copy of each assessment shall be placed in each clients file.

● Based on the above assessments, a Treatment Plan shall be developed for each client by the contractor, or in the case at hand, BI.

● Trained caseworkers shall be provided by the contractor, or in the case at hand, BI. The Treatment Plan shall be developed and then be signed by the caseworker, DRC Director, parole officer liaison and client by the end of the second week.

All of the foregoing are hereinafter collectively referred to as "Phase I Requirements."

### Phase 2

During Phase 2 of the program, clients are to remain in Phase 2 for approximately 30 to 45

days, not including the time spent in Phase 1.  The determined amount of time spent in this phase shall be based on assessment outcomes.

- The minimum reporting time shall be five days (5) a week for a minimum of five hours per day at the outset.  High risk and unemployed clients are required to spend a maximum amount of days and hours at the DRC unless passes are issued for excused absences.

- Excused absences are only for a structured activity such as educational or job training, job search, court appointments, parole reporting etc. Prior to granting such pass, DRC staff must consult with the parole liaison officer.

- Clients must "call-in" on non reporting days which "call-ins" shall be documented in the client file.

- Scheduled programming based on assessments must be delivered during phase II.

- All clients must be scheduled and attend cognitive skills, anger management, employee readiness groups as well as job search counseling workshops.

- All clients shall receive and DRC shall provide educational programming for literacy, pre-GED, GED, ESL and computer training.

- DRC shall provide an employment readiness and job placement program for all clients.

- At the time of discharge DRC must place a minimum of 60 percent of job readiness clients into full or part time position or an appropriate occupational training program.

- DRC shall provide substance abuse awareness and treatment programs.

- The DRC shall offer and provide independent living skills training which shall include cognitive development, lay skills, etc.

- The DRC must provide family counseling which shall include educational domestic violence, parenting skills and problem resolution techniques.

-6-

- The DRC shall provide two nutritionally satisfying meals per day, Monday through Friday and breakfast or brunch on Sunday and Saturday. Client shall be provided all meals free of charge.

- The contractor, or in the case at hand, BI, shall assist clients with transportation to and from the DRC as well as to court appointments when the need has been established.

All of the foregoing are hereinafter collectively referred to as "Phase II Requirements."

### Phase 3

- Clients shall report to the DRC a minimum of three days a week with required attendance in at least one session or workshop each reporting day.

- Clients must either be employed or full time students as verified by the DRC staff.

- Clients shall not progress to Phase III unless significant accomplishments have been demonstrated in their treatment plans.

- A written discharge summary shall be completed, discussed and provided to the parole officer.

- Extended length of stay shall only be allowed as a special condition of parole at the time of parole release or at any time during the period of parole supervision. The DRC or the parole officer liaison along with the approval of a district parole office to have the option to extend the length of client's participation in the program.

All of the foregoing are hereinafter collectively referred to as "Phase III Requirements."

The Phase I Requirements, Phase II Requirements, and Phase III Requirements are hereinafter collectively referred to as the "DRC Program Requirements."

22.    A SPB Evaluation Committee reviewed proposals received pursuant to the Bid Specifications on October 14, 2004. The SPB advised defendant BI Incorporated through a written "notice of award" that it had been selected to receive funding for its facility located in Atlantic City,

New Jersey for the DRC in Atlantic City. The award was made on the basis of the proposal submitted by BI. Subsequent thereto, a contract was entered into between the State of New Jersey, New Jersey State Parole Board and BI Incorporated for a period of three years beginning November 15, 2004 and extending through November 14, 2007 (the "DRC Contract"), a copy of which is attached hereto and made a part hereof and marked as **Exhibit "B"**.

23.     It was specifically understood and agreed that the Request For Proposal and Bid Specifications constituted the scope of work of the DRC Contract and that the contractor, BI, in accepting the award, expressly agreed to perform all acts and services and comply with all duties and promises as described in the DRC Contract and in the Bid Specifications. The per diem rate for the contract period was $46.00 per diem payment for each parolee assigned to the Atlantic City DRC.

24.     Pursuant to the DRC Contract, each month BI was required to complete and submit to the SPB a certification contained in a State of New Jersey payment voucher form for the previous month a listing of program participants, specifying each full day that a parolee was assigned to the program.

### V. The False Claims

25.     The false claims consist of the defendant BI submitting invoices and request for payment and claims for services rendered pursuant to the DRC Contract and Bid Specifications that contained a false certification that the services, specifically, that the DRC Program Requirements had been provided to each of the parolees during the billing period in question, and certifying that *"the within payment voucher is correct in all its particulars, that the described goods and services have been furnished or rendered and that no bonus has been given or received on account of said document"*. This certification and presentment of these claims and false certification to the SPB satisfies the requirement of the False Claims Act that a claim be presented for payment. While the evidence provided is focused on the Atlantic City DRC, Relators believe that BI was engaging in the same practices at Elizabeth and Perth Amboy and at all others locations in New Jersey and elsewhere

-8-

in which BI operates day reporting centers or other re-entry programs that are funded through grants from the DOJ and DOC.

26. Originating in November 2006 the Relators discovered through their own direct and independent investigation or observation deficiencies and problems with the DRC in Atlantic City operated by BI. These problems or deficiencies consisted of the following:

o The State of New Jersey was paying the DRC for services that weren't being rendered to or for the parolees during each of the Phases. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o Parolees were not showing up at the DRC and the parolees were not being discharged after missing three days as per the DRC Contract. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o Supervisors, when parole officer liaisons in charge of the financial authentication for the Atlantic City DRC brought these concerns to their attention, specifically District Parole Supervisor John Sauk, were told in no uncertain terms to "leave it alone".

o Notwithstanding that the program is supposed to consist of three phases and no more than 90 days it was not uncommon for a parolee to extend beyond 90 days in the program and that extensions were granted on a regular basis without getting the proper authorization or following the correct procedures. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o Contractual resources are described herein that were mandated were not available to all parolees. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC

-9-

Program Requirements.

o   Parolee absences were tolerated even though there was no good cause and Parolees were allowed to call in to the program rather than actually attending. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   Specific records of specific parolees were reviewed without appropriate action being taken, specifically parolees Edward Woodley No. 496711, Charles Pool No. 431676 and Tony Cotton No. 442274.

o   Payment was made for individuals who had been discharged from the program or who had absconded.

o   Notwithstanding that operators of the DRC were to assure that assigned parolees were continuously engaged in program-related activities and services provided throughout each program day, this was not done. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   BI was not providing services they were contracted to do and were keeping parolees on their roster who were either incarcerated or not showing up to the program. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   There existed a practice whereby if parolees would call in to the program and receive credit for participating in the program or the parolee would not show up and the State Parole Board would be billed on a per diem basis for those parolees. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   There was a discernable increase in parolees calling in on the weekends and not participating

-10-

in the program, as evidenced by the sign-in sheets. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   Whether or not a parolee shows up or doesn't, or calls in or doesn't, the SPB was still billed. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   There is an excessive amount of absenteeism. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

o   Parole officers Anthony Smith and Kevin Thurlow who were liaisons for the program stated they were never told what they were supposed to do as the liaison, and never shown a contract for the facility, never received any training with respect to the additional duties as the DRC liaison. Both felt that the BI was not providing the services it should be providing and both also found that they were not rendering the services. There was pressure to "get the numbers up" at the DRC to keep them at a maximum of 75 at all times.

o   SPB Officers Thurlow and Smith were told by supervisors to "sign off on the bills"verifying compliance with the program even though they did not observe the services being provided and had complained that such mandated services were, in fact, not being provided.

o   At one point, District Office #8 in Atlantic City was mandating that parole officers refer all parolees to the program, regardless of a need for service.

o   After officers Thurlow and Smith refused to sign the verification sheets, DPS Sauk signed the sheets and admittedly did not verify attendance, rather he relied on the word of the vendor (BI).

o   BI failed to provide the State Parole Board with pre-employment screening on employees at

-11-

the Day Reporting Program, specifically applications for Melinda Roberts and Fernando Hillian who was the sister and son-in-law of State Parole Board member Ruby Washington and who became employed with BI.

o   That Parole Officers Smith and Thurlow complained about the deficiencies to supervisory personnel but were for the most part ignored.

o   By way of example additional individuals were identified as parolees who were not participating in the program or had absconded from parole yet the State Parole Board was still billed for services, specifically Trenton Davis No. 517269, a parole absconder was billed for the period September 1, 2006 to September 30, 2006, Ladanya Mason No. 508701 absconded and remained on the roster. Even though she attended for one day the SPB was billed for seven days.

Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

27.   The records of BI consisting of sign-in sheets, certified bills, and attendance verification forms shows that there are discrepancies with regard to the records and that it was well known. Notwithstanding the foregoing, BI continuously certified to the State that each of the parolees were receiving all of the services and that BI was fulfilling all of the DRC Program Requirements.

28.   In addition to the foregoing, there were also violations of pre-screening employment process for BI as at least two employees were identified as not having routine background investigations prior to their employment and they were also reported to have familial relationships with Board member Ruby Washington.

29.   BI received payments by forwarding one or some of the following documents consisting of a payment voucher, agency fee by day billing sheet, Day Reporting Center, weekly account form, outpatient counseling forms, and DRC extended services request form. Daily program

-12-

rosters were not obtained to verify the information submitted by BI.

30.     The Requests for payment and related information was processed and forwarded to Donald Weinbaum Chief of Fiscal and Administrative Services of the State Parole Board for payment without significant or adequate review or scrutiny. In summary the average monthly payment submitted to BI by the State Parole Board was in excess of $80,000.00 which relaters believe constitutes false claims. Set forth below is a summary of the monthly billings to which Relators have obtained.

31.     In each case, BI submitted a request for payment, usually on a monthly basis on a State of New Jersey Payment Voucher, certifying that *"the within payment voucher is correct in all its particulars, that the described goods and services have been furnished or rendered and that no bonus has been given or received on account of said document"*.

32.     The Payment Voucher identifies that "goods or services" as the "Day Reporting Participation"which means the BI Contract terms and conditions which incorporates and includes the Bid Specifications that contain the DRC Program Requirements.

33.     The payment request was based on the number of program participants that were registered for that month times the number of days in the month that they were "participants" times the per diem contractual rate of 46.00 per day. Set forth below is a partial summary of the payment voucher requests submitted and made for the Atlantic City DRC

## A. **Billing Summary (Partial)**

| Month | Amount | |
|---|---|---|
| March 21, 2005 | $35,788.00 | Bill for January 2005 |
| April 11, 2005 | $55,798.00 | Bill for February 2005 |
| May 23, 2005 | $97,520.00 | Bill for April 2005 |
| June 20, 2005 | $82,340.00 | Bill for March 2005 |

| | | |
|---|---|---|
| July 21, 2005 | $80,868.00 | Bill for May 2005 |
| August 2, 2005 | $100,510.00 | Bill for June 2005 |
| September 26, 2005 | $108,928.00 | Bill for July 2005 |
| October 7, 2005 | $93,196.00 | Bill for August 2005 |
| November 18, 2005 | $95,772.00 | Bill for September 2005 |
| January 20, 2006 | $84,180.00 | Bill for October 2005 |
| January 25, 2006 | $87.078.00 | |
| April 6, 2006 | $109,250.00 | Bill for January 2006 |
| April 27, 2006 | $92,506.00 | |
| March 20, 2006 | $102,718.00 | Bill for December 2005 |
| June 5, 2006 | $116,656.00 | |
| July 20, 2006 | $95,174.00 | |
| July 20, 2006 | $87,676.00 | Bill for May 2006 |
| August, 2006 | $97,658.00 | |
| August 8, 2006 | $85,422.00 | Bill for June 2006 |
| September, 2006 | $107,962.00 | Bill for September 2006 |
| October, 2006 | $104,696.00 | |
| October 19, 2006 | $88,090.00 | |

### V.  False Claims Act, 31 USC 3729(a)

Title 31 of the United States Code, section 3729(a)  provides that any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2)     knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)     conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

is liable to the United States Government for a civil penalty of not less than $5,500.00 and not

more than $11,000.00, plus 3 times the amount of damages which the Government sustains because of the act of that person.

34.     A claim that is actually filed with a state agency such as the SPB, as is the case here and then channeled by the state agency to the federal government or based on funds received from the federal government satisfies the False Claims Act requirement that the claim be presented to the federal government.

35.     The  business documents and records of BI identified below, all of which are incorporated herein by reference, shows, inter alia, that (i) BI certified on a monthly basis that all of the DRC Program Requirements were being fulfilled for each parolee registered to the DRC program in Atlantic City, (ii) the attendance records demonstrate that it was routine procedure to submit claims for payment for parolees who did not show up, or only called instead of showing up, and (iii) that there is no evidence that Program Requirements were not being met.

January 2005 Billing Records dated March 21, 2005 - includes (i) invoice transmittal from James Greeby to Carmella Elmer, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

February 2005 Billing Records dated April 11, 2005 - includes (I) invoice transmittal from James Greeby to Carmella Elmer, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

March 2005 Billing Records dated June 20, 2005 - includes (I) invoice transmittal from James Greeby to Carmella Elmer, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

April 2005 Billing Records dated May 23, 2005 - includes (I) invoice transmittal from James Greeby to Carmella Elmer, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

May 2005 Billing Records dated July 21, 2005 - includes (I) invoice transmittal from James Greeby to Carmella Elmer, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ

Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

June 2005 Billing Records dated August 2, 2005 - includes (I) invoice transmittal from James Greeby to Carmella Elmer, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

July 2005 Billing Records dated September 26, 2005 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Acting Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

August 2005 Billing Records dated October 7, 2005 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

September 2005 Billing Records dated November 18, 2005 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

October 2005 Billing Records dated January 20, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

November 2005 Billing Records dated January 25, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

December 2005 Attendance Records - BI records consisting of daily attendance records for parolees assigned to the DRC.

January 2006 Billing Records dated April 6, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

February 2006 Billing Records dated April 27, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes

-16-

a calculation of the number of days billed for each of the parolees

March 2006 Billing Records dated June 5, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

April 2006 Billing Records dated July 20, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

May 2006 Billing Records dated July 20, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

June 2006 Billing Records dated August 8, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii) BI invoice to State Parole Board, (iii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

July 2006 Billing Records dated October 19, 2006 - includes (I) invoice transmittal from James Greeby to Donald Weinbaum, Chief of Fiscal Unit, (ii)  NJ Payment Voucher including BI certification, (iii) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

August 2006 Billing Records dated August 31, 2006 - includes (I)  BI invoice to State Parole Board, (ii) NJ Payment Voucher including BI certification, (iv) parolee attendance records that includes a calculation of the number of days billed for each of the parolees

September 2006 Billing Records dated September 30, 2006 - includes (I)  BI invoice to State Parole Board, (ii) NJ Payment Voucher including BI certification, (iii) parolee attendance records that includes a calculation of the number of days billed for each of the parolees and (iv) case management chronos for 15parolees

October 2006 Billing Records dated October 31, 2006 - includes (I)  BI invoice to State Parole Board, (ii) NJ Payment Voucher including BI certification, (iii) parolee attendance records that includes a calculation of the number of days billed for each of the parolees.

36.    These records identify, on a monthly basis the parolees that were enrolled in the

DRC in Atlantic City and identify the "start date" for each parolee. An analysis of these records

demonstrate the deficiencies set forth above. The start date of each parolee provides the beginning point for each parolee's time line in terms of what Phase they were in or should have been in. With this time line, the services that such parolee should have been receiving and the attendance that was required, are easily assessable. The records further demonstrate that the parolees were not fulfilling the attendance requirements and BI was not providing the requisite services. At the same time, they were submitting certifications and claims for payment that all Program Requirements were being met for all parolees.

37.     Defendant's actions as set forth above constitutes the making of false claims to the United States Government and is a violation of 31 U.S.C. 3729(a)(1)(2) and (3).

38.     Pursuant to 31 U.S.C. 3729(a), any person who violates the provisions set forth herein, is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the U.S. Government sustains as a result of Defendant's making of false claims as hereinabove set forth.

**WHEREFORE,** Plaintiff requests that the Court enter an award in favor of Plaintiff and against the Defendant for all sums authorized under and pursuant to 31 U.S.C. 3729(a).

Respectfully Submitted

**BEGELMAN & ORLOW, P.C.**

BY:

Ross Begelman, Esq.
Marc M. Orlow, Esq.

-18-